# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3891-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.C.[1] and J.A.,

     Defendants,

and

E.G.,

     Defendant-Appellant.

_____

IN THE MATTER OF J.C.,
a minor.

_____

Submitted January 6, 2026 – Decided January 15, 2026

Before Judges Gilson, Firko, and Perez Friscia.

---

[1] We use initials and pseudonyms to protect the identity of the family. R. 1:38-3(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FN-02-0097-23.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Laura M. Kalik, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor J.C. (Meredith A. Pollock, Deputy Public Defender, of counsel; Daniel L. J. Adamek, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In this Title 9 action brought by the Division of Child Protection and Permanency (Division), defendant E.G. (Earl), the former live-in boyfriend of defendant S.C. (Sara), the biological mother of J.C. (Justine), appeals from the Family Part's June 25, 2024 order. The judge found Earl had abused Justine in violation of N.J.S.A. 9:6-8.21(c)(1) by slapping her on multiple occasions while Justine was under his care and supervision. We affirm.

I.

The pertinent facts were developed in depth at a five-day fact-finding hearing conducted over non-consecutive days in March, April, and May 2024.

The Division presented expert testimony from medical doctors, who have expertise in pediatrics and pediatric radiology, an advanced nurse practitioner, and two fact witnesses. Earl testified and presented experts in pediatrics, radiology, and pediatric radiology, and Sara as a fact witness. The Division did not substantiate that Sara had committed abuse or neglect, and she is not participating in this appeal. Defendant J.A. is Justine's biological father and is deceased.

In 2023, Sara, Earl, and Justine were living together. On May 11, 2023, Sara and Earl brought then eleven-month-old Justine to Holy Name Medical Center (HNMC) in Teaneck because she had a fever and was experiencing respiratory issues for several days. That day, HNMC staff notified the Division regarding concerns about Justine. The Division's special response unit initiated an investigation and assigned caseworker Arianex Peguero to meet with Dr. Joanne Kambolis-Vratsanos, the attending emergency room physican at HNMC. The Division also notified the Bergen County Prosecutor's Office (BCPO).

Dr. Kambolis-Vratsanos advised Peguero that she was "taken aback" when she saw Justine's face in the examination room. The doctor reported Sara was "very defensive and short" when questioned about what happened to Justine's face and responded she was "not here for that" but was "here because

[Justine] has a fever." Sara told Dr. Kambolis-Vratsanos that Earl watched Justine earlier in the day while Sara was at work, and the infant had fallen "off her crib." Earl left the hospital during the investigation.

Based on her observations, Dr. Kambolis-Vratsanos found Justine had "multiple linear marks of erythema, bruising, and abrasions to bilateral cheeks" and a faded bruise to her right thigh. The doctor opined the marks were "slap marks to the cheeks and possibly a grab or pinch mark to the thigh." According to Dr. Kambolis-Vratsanos, some of the marks looked like red "finger marks," a "thumb" print, and "old bruising," which she stated were "textbook signs of abuse." Justine was diagnosed with parainfluenza and discharged.

Peguero then interviewed Sara, who explained Earl watched Justine on the day in question because her main caregiver, R.C., the maternal grandmother, was unavailable. Sara explained that she worked full time Monday through Friday and attended school Monday through Thursday in the evenings. On the day in question, Sara had come home from work during her lunch break and observed Justine was running a fever. Sara stated Earl told her that Justine had tried standing in her crib, caught her foot in the crib's bumper, "fumbled," and hit her face on the crib's railing. Sara expressed no concerns about Earl caring

4

for Justine and stated she was learning how to stand and walk, and therefore, "falls down a lot."

Peguero spoke to Detective Michael Venezia of the BCPO, who asked her to bring Sara, Justine, and R.C. to the BCPO to be interviewed. Division caseworker Halszka Oczkos observed the interviews. Sara told the detective Earl left HNMC abruptly that day because he had a curfew due to his parole. During R.C.'s interview, she denied that Justine frequently falls.

The following day, Detective Venezia interviewed Earl, who advised he watched Justine on May 7, 2023. He stated, "you could tell [she] hit her face on the crib" and that the left side of Justine's face was swollen and sensitive to the touch. Earl explained Justine had fallen out of her crib and onto the hardwood floor. He also acknowledged he was Justine's sole caretaker on May 11, 2023, the day she was taken to HNMC. According to Earl, he heard Justine drop her bottle, and after entering her room, saw her "standing in the crib and was trying to balance herself but she can't." Earl claimed he saw Justine fall in the crib and hit the right side of her face "on the corner" of the crib's railing and on a toy inside the crib. He explained he left HNMC that day "to get gas." Earl denied harming Justine in any way.

A-3891-23

On May 12, 2023, Justine was taken to Hackensack University Medical Center (HUMC) accompanied by caseworker Oczkos due to concerns R.C. raised regarding the infant's right leg. Oczkos observed Justine was not bearing weight on the leg and appeared sensitive to the touch. Diagnostic tests were ordered, and the results were negative for any trauma.

On May 15, 2023, advanced nurse practitioner MaryBeth Mariano from the Audrey Hepburn Children's House (AHCH), a diagnostic and treatment center for child abuse and neglect, evaluated Justine in R.C.'s presence. After being provided with Justine's history from Sara and Earl, Mariano recommended Justine undergo a skeletal survey. That day, the Division implemented a safety protection plan requiring Sara and Earl to have supervised contact with Justine. Sara moved in with her mother, R.C., who supervised Sara's contact with Justine.

At a follow-up visit on May 22, 2023, Mariano concluded Justine's facial bruises reflect slap marks "and are therefore consistent with non-accidental injury" or child abuse.

On June 23, 2023, the Division filed a verified complaint for care and supervision of Justine. The matter evolved into an order to show cause seeking care and supervision of Justine under Title 9. On July 7, 2023, Mariano issued

6

an addendum to her report based on the skeletal survey performed, which indicated a healing fracture in Justine's right tibia. Mariano opined this kind of fracture was a "non-specific finding" likely resulting from a "non-accidental injury, such as a grab, or from [an] accidental injury, such as a fall."

On August 23, 2023, Earl was criminally charged with child endangerment and simple assault. Sara was also charged with child endangerment.[2] A no contact order was issued between Sara and Justine as well as between Earl, Sara, and Justine.

During the hearing, the Division called caseworkers Elsa Lozano and Oczkos, Dr. Kambolis-Vratsanos, Mariano, and pediatric radiologist Dr. Aaron Hodes as witnesses. Lozano testified that she was the initial Division worker assigned to the case and authenticated the Division's records as its custodian of records.

Oczkos testified about what Sara said during the BCPO interview. Earl objected on hearsay grounds, but the judge overruled the objection, reasoning that Sara is a named defendant in the matter despite no substantiation by the Division, and she was available to rebut the testimony. Oczkos testified about

---

[2] The status of the criminal charges against Earl and Sara is not contained in the record.

A-3891-23

R.C.'s concerns about Justine's right leg, and R.C.'s belief the infant was in pain when her leg was touched. Oczkos testified that her report confirmed Justine's injuries were not accidental and were instead caused by abuse. Oczkos stated she was aware of Earl's past criminal history and criminal charges related to this case, but that did not influence the Division's decision to substantiate him. Oczkos testified that Earl denied causing any injury to Justine.

The judge found Dr. Kambolis-Vratsanos qualified as an expert in the fields of general pediatric and emergency medicine. Dr. Kambolis-Vratsanos testified that Justine's marks on her face led the doctor "to believe that it was not just one offense" of suspected child abuse. The doctor opined the scratches to Justine's cheeks were "fresh" and likely occurred within hours and no longer than a day before she went to HNMC. However, the doctor testified the mark on Justine's nose was older because it was "scabbed over." Dr. Kambolis-Vratsanos concluded that Justine's marks followed a pattern of linear marks with "erythema and bruising."

Mariano was qualified as an expert in pediatric nursing and in conducting medical examinations in child abuse and neglect cases. Mariano testified as to the "red, linear bruising" on the left side of Justine's face and pointed out the marks on her cheeks were different from those typically present when children

8

fall due to "cruising or walking." Mariano explained that "just the presence of bruising alone in [Justine's] young age, and the location of it on the face, is a concern." Mariano further testified that "typically when children fall, especially toddlers or babies," they usually hit the "bony prominence," "like the forehead" or the "back of the head." Mariano explained it would be "very rare" that a child would hit his or her cheeks. Mariano further stated Justine's linear bruising indicated a "pattern injury," which "always raises concern for a non-accidental event" because an "object" is unusually involved:

> [i]n this case, it was concerning that [it]. . . reflected the outline of a hand, because that's when you get slapped. With a hand, the typical presentation of that is parallel linear bruising with central sparing, meaning an area in between those two parallel linear bruises that doesn't have any bruising.

Mariano concluded the linear bruising was "non-accidental and from a slap mark." As to whether Justine's parainfluenza could have caused redness to her face, she agreed, but stated it could not have caused "bruising of the skin." Instead, it would have showed "widespread redness," or look more like a "rash," which would probably be on "both cheeks," and "the same kind of color." Mariano stated Justine herself could not have caused the injuries herself because "she would [not] be capable of [in]flicting it with that speed and intensity," at her young age, "because it takes a pretty intense slap to be able" to "cause that

9

kind of a bruise." In Mariano's opinion, Justine was the victim of child abuse. Regarding her addendum, Mariano testified that Justine's leg fracture was a "non-specific injury," but "concerning still, because of the fact that she was [not] walking."

On cross-examination, when asked whether the toy train could have caused Justine's injuries, Mariano responded "you could lay down on top of the train, but [it is] not going to result in that kind of bruising," or in "three patterns like that." Instead, it would have caused a generalized bruise as opposed to linear.

Dr. Hodes was qualified as an expert in medicine and pediatric radiology. Based on the skeletal survey performed on Justine, he opined she had a "healing right tibial fracture," and the injury most likely occurred within ten days of May 12, 2023. Dr. Hodes testified it was "possible" the fracture had a non-accidental cause.

Dr. Levenbrown was qualified as an expert in pediatrics, radiology, and pediatric radiology. He never examined Justine. Based on his review of the records from the Division, BCPO, and AHCH, Dr. Levenbrown concluded Justine's facial bruising could have been caused by the first fall out of the crib. Dr. Levenbrown testified that Justine's falling onto the toy train could have

caused "a bruise at the point of impact" and indicated the bruising was "non-specific." He "really wonder[ed] if some of the redness on the face could have been due to the viral infection that [Justine] had."

Dr. Levenbrown opined the May 7, 2023 fall out of the crib "may well have been the cause of the hairline fracture in the upper right tibia," which could have occurred "up to seven days prior to May 12[, 2023]." According to Dr. Levenbrown, the height of the mattress "absolutely" provided an "unquestionable" risk of falling out of the crib for Justine, who might have tried to pull herself up. As to the abrasion on Justine's nose, Dr. Levenbrown suggested it could have been caused by her long fingernails. Dr. Levenbrown concluded Justine's fall out of the crib and resulting injuries were "accidental" in nature.

Sara testified on Earl's behalf solely to authenticate a photograph of a toy train that had been in Justine's crib on May 11, 2023.

Earl testified he witnessed Justine hit the right side of her face on the corner of the crib's railing. According to Earl, she then slid and hit her face again, but this time on the toy train. On cross-examination, Earl refused to explain whether the toy train also inflicted injury to the left side of Justine's face. Earl's counsel asked him whether he was invoking his Fifth Amendment right

11

against incrimination. The judge noted "[t]his is not a criminal case" and concluded Earl refused to answer whether Justine hit the left side of her face.

At the hearing's conclusion, the judge found Earl abused Justine within the meaning of N.J.S.A. 9:6-8.21(c). In her comprehensive oral opinion, the judge found the Division's witnesses credible, specifically noting Dr. Kambolis-Vratsanos and Mariano's testimony as "very persuasive." In contrast, the judge determined Earl was "clearly being evasive when confronted about the child's injuries by refusing to answer counsel's questions," and that he "clearly lacked veracity." The judge reasoned Earl had a "very poor demeanor . . . making faces, mocking, and even laughing at the various witnesses [the Division] presented."

The judge was not persuaded by Dr. Levenbrown's testimony and characterized it as "generalized and speculative," emphasizing he "did not personally examine" Justine. This appeal followed.

Before us, Earl makes four primary arguments: (1) there was insufficient evidence to support the judge's legal conclusion that he abused or neglected Justine; (2) the judge improperly relied on incompetent hearsay; (3) the proceedings violated his due process rights and principles of fundamental fairness; and (4) the judge erred in drawing a negative inference from Earl's

12                                                                                    A-3891-23

invocation of his Fifth Amendment right against self-incrimination. Justine's Law Guardian joins with the Division in opposing this appeal.

II.

It is well settled that the scope of appellate review in this non-jury Title 9 setting is narrow. Appellate review of the Family Part's abuse or neglect finding is limited. N.J. Div. of Youth & Fam. Servs. v. S.H., 439 N.J. Super. 137, 144 (App. Div. 2015) (citing Cesare v. Cesare, 154 N.J. 394, 411 (1998)). The court must determine whether the decision "is supported by '"substantial and credible evidence" in the record.'" N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007)).

"Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare, 154 N.J. at 413; see also N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010). In that vein, appellate courts should "defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting

M.M., 189 N.J. at 293). A family court's decision should not be overturned unless it went "so 'wide of the mark'" that reversal is needed "to correct an injustice." F.M., 211 N.J. at 448 (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)).

"Title 9 controls the adjudication of abuse and neglect cases." M.C. III, 201 N.J. at 343 (citing N.J.S.A. 9:6-8.21 to -8.73). "The focus of Title 9 'is not the "culpability of parental conduct" but rather "the protection of children."'" N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 368 (2017) (quoting Dep't of Child. & Fams., Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015)).

Title 9 defines an "abused or neglected child" as one under the age of eighteen whose:

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [their] parent or guardian . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment[.]
>
> [N.J.S.A. 9:6-8.21(c)(4).]

The Division "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). Each case of alleged abuse is "generally fact sensitive." Id. at 33. The proofs must be evaluated based on the totality of the circumstances. Id. at 39.

Once, as here, abuse has been substantiated, the offender's conduct must be logged in the child abuse registry as "the repository of all information regarding child abuse or neglect that is accessible to the public pursuant to State and federal law." N.J.S.A. 9:6-8.11. The agency has no discretion under the statute to withhold or remove an offender's name from the registry once the Division has substantiated the allegations of abuse. See, e.g., N.J. Dep't. of Child & Fams. v. L.O., 460 N.J. Super. 1, 12 (App. Div. 2019).

Applying these well-established standards of review, we affirm the judge's determination of Earl's abuse of Justine, substantially for the sound reasons set forth in the judge's detailed oral decision. We comment here on Earl's specific arguments, none of which have merit.

15

## III.

First, Earl argues that the judge's factual findings were not based upon a preponderance of adequate, substantial, credible evidence as required by <u>N.J. Div. of Youth & Fam. Servs. v. R.G.</u>, 217 N.J. 527, 552-53 (2014). As a threshold matter, Earl contends the judge did not indicate which subsection of N.J.S.A. 9:6-8.21(c), she applied to her findings, in violation of <u>Rule</u> 1:7-4(a).[3] Accordingly, Earl contends the judgment inhibits meaningful appellate review, and the decision should be reversed. Earl maintains there was insufficient competent evidence to support the judge's conclusion that he physically abused Justine within the meaning of N.J.S.A. 9:6-8.21(c)(1), which provides:

> [an] [a]bused or neglected child means a child less than [eighteen] years of age whose parent or <u>guardian</u>, as herein defined:
>
> (1) inflicts or allows to be inflicted upon such child physical injury by <u>other than accidental means</u> which causes or creates a substantial risk of death, or serious or protracted disfigurement, or <u>protracted impairment of physical or emotional health</u> or protracted loss or impairment of the function of any bodily organ[.]
>
> [N.J.S.A. 9:6-8.21(c)(1) (emphasis added).]

---

[3] "The court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury, on every motion decided by a written order that is appealable as of right. . . ." <u>R.</u> 1:7-4(a).

Further, Earl alleges that, because the Division's complaint states the action was brought under N.J.S.A. 9:6-8.21(c)(4), the judge should have required the Division to amend its complaint. Earl contends the failure to do so resulted in his statutory and constitutional rights being violated, citing N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 401 (2009). N.J.S.A. 9:6-8.21(c)(4) states:

> [an] [a]bused or neglected child means a child less than [eighteen] years of age whose parent or guardian, as herein defined:
>
> . . . .
>
> (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his [or her] parent or guardian, as herein defined, to exercise a minimum degree of care . . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]
>
> [N.J.S.A. 9:6-8.21(c)(4) (emphasis added).]

Here, although the judge did not specify on the record what subsection of Title 9 applied, she did designate the relevant subsection in her June 26, 2024

17

order.  N.J.S.A. 9:6-8.21(c)(1).  In her oral opinion, the judge defined an abused child as:

> a child who has been abused or neglected by his or her parent, guardian, or caregiver when that individual inflicts, or allows to be inflicted upon such child, physical injury by other than accidental means which causes or creates a substantial risk of death or serious emotional or bodily injury.

We therefore conclude the Division demonstrated, by a preponderance of the evidence, that Earl abused Justine under both subsections of the statutes.  First, we analyze how the Division met its burden under N.J.S.A. 9:6-8.21(c)(1).

Earl contends the injuries Justine sustained were not physical injuries that caused "serious or protracted impairment" of physical or emotional health, as required by N.J.S.A. 9:6-8.21(c)(1).  He argues there was no finding by the judge under this subsection, and the evidence failed to show either the severity or long-term effects of Justine's injuries.  Earl maintains that an affirmance by this court would result in a finding of abuse premised on "insignificant, temporary markings on a child's face."

Further, Earl urges that the marks and bruises on Justine did not constitute "serious or protracted impairment" because they did not warrant any medical attention, "not even a band aid," and resolved quickly.  Earl cites to Dr. Kambolis-Vratsanos's testimony that they were "superficial injuries."  Earl

contends the doctor merely diagnosed Justine with a simple viral infection and that her diagnosis of "suspected child abuse" was coded as a secondary diagnosis in the medical records. Earl maintains the doctor's suspicions of child abuse were "clearly not raised enough" because she did not prescribe additional testing or diagnostic imaging during Justine's initial hospital visit. Instead, the only treatment Dr. Kambolis-Vratsanos prescribed was over-the-counter medication to lower Justine's fever and treat any pain, and the doctor's only follow-up recommendation was for an evaluation by her pediatrician.

Earl also contends Mariano's testimony supports his position Justine did not suffer "serious or protracted" impairment under N.J.S.A. 9:6-8.21(c)(1). Earl claims Mariano described Justine during her May 15, 2023 evaluation as "smiling and playful and in no acute distress." Further, at Justine's follow-up evaluation, Mariano confirmed the bruising on Justine's face was resolved and healed. Thus, Earl contends Justine's injuries do not constitute a sufficiently egregious finding to warrant a per se finding of abuse or neglect under Title 9, citing Dep't. of Child. & Fams., Div. of Youth & Family Servs. v. K.A., 413 N.J. Super. 504, 511-12 (App. Div. 2010) (holding there was no excessive corporal punishment where the child sustained bruises that did not require medical intervention).

Applying our limited scope of review and the standards to the matter before us, we are satisfied there was competent, credible evidence in the record to support the judge's finding that Earl abused or neglected Justine. Earl's argument is further weakened by the fact that the Division only had to prove that he caused a created a <u>risk</u> of protracted impairment of physical or emotional health, even if the prior sustained injuries did not cause that in and of itself. Moreover, Title 9 was implemented to safeguard children from further injury and possible death. <u>N.J. Div. of Child Prot. & Permanency v. Y.N.</u>, 220 N.J. 165, 178 (2014). The judge found Justine "presented with linear bruising in different stages of healing," which led the judge to properly conclude the child had been "slapped on different occasions," and thus finding Earl caused physical injury on more than one occasion. The excessive slapping of an infant can impair the child's physical or mental health.

The judge emphasized Mariano's credible testimony, opining "the linear pattern reflected the outline of a handprint, which is typical . . . of a high velocity slap to the face." We are unpersuaded by Earl's argument that the above injuries were not serious enough to cause disfigurement because the ongoing nature of Justine's injuries were sufficient to cause a substantial risk of future injury future as defined by Title 9.

Equally unavailing is Earl's argument that Justine's marks fail to satisfy the definition of an impairment of emotional health. Although Justine was "smiling" during Mariano's evaluation, the record also shows Dr. Kambolis-Vratsanos testified that a nurse requested she examine Justine at HNMC because "the baby was crying inconsolably."

Second, Earl contends the Division failed to satisfy the second element of N.J.S.A. 9:6-8.21(c)(1), which requires proof that a parent or guardian inflicted upon a child "physical injury by other than accidental means." He urges the record demonstrates that Justine's marks were the result of her accidentally falling out of her crib onto a hardwood floor and another instance of falling onto a toy train in her crib. Earl argues it was undisputed that Justine's crib mattress was too high and posed a significant risk of injury, as Dr. Kambolis-Vratsanos and Mariano testified that Justine was exposed to a fall risk.

Earl relies on Dr. Levenbrown's testimony opining there were multiple explanations for the markings on Justine's face, and his testimony that her facial bruising was consistent with the two reported falls.

However, the judge did not find Dr. Levenbrown credible. Importantly, the judge highlighted that she gave more weight to Dr. Kambolis-Vratsanos's and Mariano's testimony because they both personally examined Justine, and Dr.

21

Levenbrown did not. Further, the judge relied on photographs in evidence depicting the linear marks and bruises on Justine's face. The judge found the Division's experts' opinions, that "dispelled the notion" the facial marks were caused by a fall, "credible" as they explained Justine would have presented with different injuries, such as hematomas to her head.

Further, the judge found Earl was not credible in asserting Justine's injuries were accidental and rejected his testimony that her facial injuries were caused by a toy train in her crib. In conclusion, there was substantial credible evidence in the record to support the judge's finding that the Division met its evidentiary burden under N.J.S.A. 9:6-8.21(1)(c)(2).

IV.

We reject Earl's argument that the judge relied on incompetent hearsay. Earl argues the judge improperly relied on hearsay contained in the Division's video interviews from the BCPO, which were not moved into evidence. Earl also challenges the judge's reliance on embedded hearsay contained in the Division's investigation summary and screening referral relating to Earl's and Sara's interviews with the BCPO, as conveyed through Oczkos.

22

Title 9 authorizes the admission of certain types of evidence at an abuse or-neglect fact-finding hearing. For instance, N.J.S.A. 9:6-8.46(a)(3) provides, in relevant part, that in a Title 9 hearing:

> any writing, record or photograph, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency shall be admissible in evidence in proof of that condition, act, transaction, occurrence or event, if the judge finds that it was made in the regular course of the business of any hospital or any other public or private institution or agency, and that it was in the regular course of such business to make it, at the time of the condition, act, transaction, occurrence or event, or within a reasonable time thereafter, shall be prima facie evidence of the facts contained in such certification.
>
> [N.J.S.A. 9:6-8.46(a)(3) (emphasis added).]

A writing or record satisfies the regular-course-of-business requirement of N.J.S.A. 9:6-8.46(a)(3) if it satisfies the business-records exception, N.J.R.E. 803(c)(6), to the hearsay rule, N.J.R.E. 802. N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 494 (App. Div. 2016). N.J.R.E. 803(c)(6) states:

> A statement contained in a writing or other record of acts, events, conditions, and, subject to [N.J.R.E.] 808,[4] opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make such writing or other record.

"This exception does not apply if the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy." Ibid.

Here, the Division's investigative summary and screening referral were admissible under N.J.S.A. 9:6-8.46(a)(3) because they are writings made as a record of a condition or event relating to Justine. Moreover, the records were made within a short time—the same day—of the events described therein. The investigative summary and screening referral were also admissible under N.J.R.E. 803(c)(6) because they were records made in the regular course of business, and it was the regular practice of the Division to make such a writing or other record. These records were trustworthy as Lozano testified to their reliability. Further, Earl fails to specifically articulate how any embedded hearsay was improperly relied upon by the judge. Nonetheless, various

---

[4] "Expert opinion that is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the court finds that the circumstances involved in rendering the opinion tend to establish its trustworthiness. . . ." N.J.R.E. 808.

statements within the documents fall under the following hearsay exceptions. See N.J.R.E. 805.[5]

Within the screening referral, statements made by Dr. Kambolis-Vratsanos to Sara and vice versa pertaining to Justine's care fall under hearsay exception N.J.R.E. 803(c)(4),[6] as they were "made in good faith for purposes of, and [were] reasonably pertinent to, [Justine's] medical diagnosis or treatment." N.J.R.E. 803(c)(4)(A). The statements "described [Justine's] medical history; past or present symptoms or sensations; their inception; or their general cause." N.J.R.E. 803(c)(4)(B). Further, any statements made by Dr. Kambolis-Vratsanos and Mariano that qualify as expert opinions were admissible under N.J.R.E. 808, as "the declarant[s] [were] produced as . . . witness[es]."

Within the investigative summary, Earl's statements to Detective Venezia during the first and second BCPO interviews are admissible under hearsay exception N.J.R.E. 803(b)(1), a statement by party-opponent. N.J.R.E.

---

[5] "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." N.J.R.E. 805.

[6] "A statement that: (A) is made in good faith for purposes of, and is reasonably pertinent to, medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." N.J.R.E 803(c)(4).

A-3891-23

803(b)(1) requires "the statement [to be] offered against a party-opponent" and is "the party-opponent's own statement, made either in an individual or in a representative capacity." Ibid. Applying N.J.R.E. 803(b)(1) here, the Division offered the statements against its opponent—Earl—and they were made by him in his individual capacity. We therefore conclude the judge did not abuse her discretion in admitting the investigative summary and screening referral.

V.

Next, Earl argues the Division repeatedly failed to comply with discovery orders and delayed access to its file in this matter. Earl asserts the Division was ordered to provide his counsel with "all medical collateral and BCPO records upon receipt" but delayed in doing so. Earl concedes most of the documents were produced prior to trial, but his attorney was "stymied" when the parties discovered in the midst of Mariano's testimony that there were additional photographs and a report from AHCH, which had not been produced. As a result, Earl maintains he was "severely prejudiced" in his ability to formulate his defense and was denied due process and fundamental fairness. Citing Matthews v. Elridge, 424 U.S. 319, 335 (1976), Earl argues he was denied a meaningful opportunity to representation and to be heard. We disagree.

26

Here, the judge clearly recognized the potential prejudice to Earl due to the Division's delay in providing discovery. For instance, the judge rescheduled the factfinding hearing twice and extended discovery deadlines three times to afford Earl's counsel with sufficient time to review discovery and prepare for the hearing. The record also shows Earl received the Division's investigative summary six months prior to the commencement of trial and confirmed on February 15, 2024, that the Division had produced all documents it was ordered to supply. During the hearing, the judge even permitted Mariano to be recalled as a witness after Earl's counsel obtained the photographs included in her report not provided by the Division during discovery. We are satisfied Rule 5:12-3[7] was complied with.

## VI.

Finally, Earl argues the judge incorrectly drew a negative inference from his refusal to answer counsel's questions about the injuries to the left side of Justine's face. "Pursuant to N.J.S.A. 2A:84A-19, and its equivalent, N.J.R.E.

---

[7] "All relevant reports of [the Division] and other reports of experts or other documents upon which the Division intends to rely shall be provided to the court and to counsel for all parties on the first return date of the order to show cause, if then available, or as soon as practicable after they become available. The Division's case file shall also be available for inspection to the attorneys for the parties without court order. All other discovery by any party shall be permitted only by leave of court for good cause shown." R. 5:12-3.

503, every person in New Jersey 'has a right to refuse to disclose in an action . . . any matter that will incriminate him or expose him to penalty . . . .'" E.S. v. H.A., 451 N.J. Super. 374, 384 (App. Div. 2017). The privilege includes the right "not to answer official questions put to him [or her] in any . . . proceeding, civil or criminal, formal or informal, where the answers might incriminate him [or her] in future criminal proceedings." Allen v. Illinois, 478 U.S. 364, 368 (1986) (quoting Minnesota v. Murphy, 465 U.S. 420, 426 (1984)).

"When a party in a civil matter asserts the privilege against self-incrimination, the fact-finder may draw an adverse inference of guilt." N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 266 (App. Div. 2018) (citing Attor v. Attor, 384 N.J. Super. 154, 165-66 (App. Div. 2006)). However, such an adverse inference is improper in the context of a Title 9 abuse and neglect fact-finding hearing, when there are related criminal charges pending against the defendant, and the defendant refuses to testify. Id. at 271.

Here, the judge improvidently drew an impermissible negative inference against Earl. However, we conclude the error was harmless given the overwhelming evidence supporting the judge's findings that Earl abused and neglected Justine.

To the extent that we have not addressed them, all other arguments raised by Earl lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3891-23